**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CINCINNATI INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 11-0271-WS-M** |
| | ) | |
| **AMERISURE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on the parties' cross-motions for summary judgment (docs. 50, 52). The motions have been briefed and are now ripe for disposition.[1]

**I.   Relevant Background.[2]**

This action is an insurance coverage dispute between two insurance companies. Plaintiff, Cincinnati Insurance Company, paid the sum of $168,842.06 in attorney's fees and expenses, as well as a $25,000 settlement payment, on behalf of its insured, G.R. Harvill, Inc., in connection with certain litigation brought against Harvill by Dolphin Key Condominium Association in Baldwin County Circuit Court. Adding a second layer of litigation onto the now-concluded

---

[1]   The Court's review of these Rule 56 motions (as to which the parties have submitted hundreds of pages of exhibits) is hampered by the parties' noncompliance with Paragraph 13(c) of the Rule 16(b) Scheduling Order, which provides that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery." (Doc. 43, ¶ 13(c).) Notwithstanding the parties' failure to adhere to this requirement, the Court in its discretion will consider the summary judgment filings in their present posture, without delaying resolution to allow for submission of the requisite courtesy copies.

[2]   The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, with respect to each motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in that party's favor.

Dolphin Key lawsuit, Cincinnati now sues Harvill's previous liability insurance carrier, defendant Amerisure Insurance Company, seeking to recover those defense and indemnity payments on theories of breach of contract, negligence, contribution, unjust enrichment, and equitable subrogation. (Doc. 34.)[3]

### A.    Harvill's Dealings with Dolphin Key.

This story is most logically told from the beginning. Harvill entered into a contract with Dolphin Key in or about April 2000. (Doc. 51, Exh. B.) That agreement contemplated that Harvill would serve as general contractor for the restoration and reconstruction of the Dolphin Key Condominium property in Orange Beach, Alabama. (*Id.*) Construction began soon thereafter. (Doc. 51, Exh. C.) On September 12, 2000, the project's architect, Dudley L. Flotte, issued "Field Order #7" to Harvill, specifying that "[a]ll … Balcony … framing to be pressure treated." (Doc. 51, Exh. E.) That same document instructed Harvill to use "treated LVL" beams to support the balconies. (*Id.*)[4] Unfortunately, Harvill informed Flotte that "they could not find a treated LVL." (Doc. 51, Exh. G, at 134.) Flotte's solution (reached after consultation with Dolphin Key and Dolphin Key's counsel) was "to use … two untreated LVL's, and make sure they wrapped it so to that moisture would not get into it …. Wrap it with the waterproof membrane … to make sure that the beam stayed watertight." (*Id.* at 135.) On October 19, 2000, Harvill confirmed in writing to Flotte that the untreated LVL beams used to support the balconies had been wrapped per the architect's instructions. (Doc. 51, Exh. J.) At that time, Dolphin Key requested that Harvill apply a treatment to the LVLs. Harvill agreed, subject to the proviso that Harvill "does not warrantee [*sic*] that the treatment will keep moisture out of LVL's." (Doc. 51, Exh. K.)

---

[3]    Neither Harvill nor Dolphin Key are parties to the present insurance coverage litigation. However, Cincinnati purports to be both subrogee and assignee of Harvill with respect to the claims it pursues against Amerisure herein. (Doc. 34, ¶¶ 21-22.) For purposes of this Order, the Court assumes (without deciding) that Cincinnati has standing to assert these causes of action against Amerisure.

[4]    The record explains that "treated LVL" is "a solid laminated piece of wood. It's an inch and three-quarter by 14, and it's treated." (Doc. 51, Exh. H, at 17.) Harvill's problem with this directive was that "[y]ou could not get treated LVL's at the time we were asked to get them" without delaying the project by approximately 60 days. (*Id.* at 18-19.)

Dolphin Key received its certificate of occupancy in August 2001, after which there were no reported issues or problems with the balconies for nearly two years. However, in July 2003, an inspector retained by Dolphin Key observed cracked stucco cladding around the edge of a balcony that he attributed to "water intrusion through or around the screws fastening the railings to the balcony. The screws appear to that [*sic*] have penetrated the waterproofing membrane on the balcony." (Doc. 51, Exh. M.) Another expert, Jimmy Fell, examined the Dolphin Key property in September 2003 and observed that, as to one particular balcony, "it is evident that the beam is sagging which would have caused the cement board to crack the way it did." (Doc. 51, Exh. N.) On December 3, 2003, Fell made specific recommendations for repairs to the balconies (mostly involving application and removal of sealants, as well as bolting together the balcony beam on Unit 4D) "to correct the existing water intrusion problems and help prevent future problems from occurring." (Doc. 51, Exh. O.) Harvill performed these repairs in early 2004, apparently to the full satisfaction of all concerned. (Doc. 51, Exhs. P & Q.)[5] Harvill neither reported this episode to Amerisure (its liability insurance carrier at that time) nor sought coverage in connection with same.

Harvill and Dolphin Key appear to have had no contact or dealings concerning the property's balconies between March 2004 and May 2007. There is no evidence of any ongoing issues, problems, defects, claims or disputes that Dolphin Key presented to Harvill during that time period; rather, by all appearances, the repairs were deemed satisfactory by Dolphin Key, the balconies appeared to be functioning properly, and the observed water intrusion issues appeared to have been corrected to the satisfaction of all concerned.[6] Dolphin Key sustained no damages,

---

[5]      Prior to the completion of this work by Harvill, Dolphin Key stated that upon performing certain specifically enumerated repairs, Harvill "will have performed the work which we feel is necessary to prevent further damage to the balconies. We will release G.R. Harvill of Liability to the unsealed flashing." (Doc. 53, Exh. 5.) All indications in the record are that Harvill performed this work to Dolphin Key's satisfaction in spring 2004, at which time (as far as both Harvill and Dolphin Key were concerned) there were no longer any pending issues, problems or claims between them. Neither Cincinnati nor Amerisure has offered record evidence suggesting otherwise. For all intents and purposes, then, the balconies at Dolphin Key Condominium were a dead issue as between Harvill and Dolphin Key from spring 2004 through spring 2007.

[6]      Indeed, Harvill confirmed as much to Amerisure during the latter's June 2007 claims investigation. At that time, Harvill notified Amerisure that, with regard to the 2004 (Continued)

expended no resources on balcony-related repairs, and endured no curtailment of its members' use and enjoyment of their balconies during this interval.

The three-year silence was abruptly shattered on May 25, 2007, when Dolphin Key's counsel wrote a letter to Harvill reflecting that, earlier that day, Dolphin Key had notified him "that sagging was observed on the east balconies of the Condominium, and that upon investigation, it was determined that water intrusion had severely damaged the outside horizontal beams of the balconies." (Doc. 51, Exh. R.) The May 25 letter further advised Harvill that Dolphin Key had already repaired six of the balconies, that an additional 15 balconies were affected, and that Dolphin Key had already hired an engineer to design repairs for those 15 balconies. (*Id.*)[7] That letter ominously alluded to litigation, intimating that, once the engineer's evaluation was complete, "[c]laims may be made based upon these findings." (*Id.*)[8] Within days

---

balcony repairs, "the owner actually signed some type of release … re: future liabilities re: the balconies; insured at that time went out and repaired the problems w/ the balconies in exchange for the release." (Doc. 51, Exh. S, at 5.) Harvill further informed Amerisure that, following those 2004 repairs, "a structural engineer went out and looked at the balconies and confirmed that all the balconies had been repaired." (*Id.*)

[7]     A structural engineer who examined the property in May 2007 reported to Dolphin Key on May 28, 2007 that "[t]he LVL member on several of the balconies has severely deteriorated. The ends of the members have been crushed by the weight of the balcony." (Doc. 53, Exh. 7.) This condition was worrisome because, as the engineer explained, "This condition has the possibility of failure of the balcony along with possible loss of life." (*Id.*) On that basis, the engineer recommended "that all the LVL members in the balconies be removed and replaced" for the entire condominium building. (*Id.*)

[8]     The timing of these events is important; therefore, it is noteworthy that the May 25 letter specifies that Dolphin Key had only informed its counsel of these balcony issues earlier that day. The letter also leaves no doubt that it marked the first time Dolphin Key's attorney had contacted Harvill about the issue, and the first time counsel had placed Harvill on notice that claims might ensue for these balcony problems. Also, while Cincinnati characterizes the May 25 letter as "requesting that G.R. Harvill, Inc. repair further damage the balconies" (doc. 51, at 4), that characterization is inaccurate. On its face, the May 25 letter did not request that Harvill do or refrain from doing anything; to the contrary, that correspondence placed Harvill on notice of balcony defects and possible claims arising from same, and invited Harvill to inspect the building before repairs were performed on the other 15 balconies if it so desired. (Doc. 51, Exh. R.) Nothing about the May 25 letter suggested that Dolphin Key was interested in working collaboratively with Harvill to redress the problem. Rather, that correspondence was an obvious prelude to a lawsuit, an initial shot across the bow anticipating a court battle. And the May 25 (Continued)

after this contact, Harvill notified both Cincinnati (its liability insurer in 2007) and Amerisure (its liability insurer from 2000 to 2004) of Dolphin Key's potential claims.  (Doc. 51, Exh. S.)  In particular, Harvill forwarded a copy of the May 25 letter to Amerisure on June 5, 2007, just 11 days after Harvill received it.  (*Id.*)  The first notice of claim that Amerisure received from Harvill was on June 4, 2007.  (Doc. 53, Exh. 8, at 22-23.)

Amerisure promptly commenced an investigation.  On June 18, 2007, Amerisure had both telephonic and written contact with Dolphin Key's counsel about the claims against Harvill. During that conversation, Dolphin Key's counsel clarified to Amerisure "that they had discovered these damages [to the balconies] within the last six months."  (Doc. 51, Exh. S.)  In a follow-up letter, Dolphin Key's counsel reiterated that "[i]n the spring of 2007, sagging was observed on the east balconies of the condominium."  (Doc. 53, Exh. 9.)  That letter made no reference of any kind to balcony problems pre-dating the spring of 2007.  Thus, Dolphin Key consistently represented to Amerisure that its claims against Harvill pertained to a species of balcony damages that were first observed in early 2007, not before.

###### B.     Harvill's Insurance Relationships with Amerisure and Cincinnati.

At various times, Harvill has been insured by each party to this litigation.  Amerisure provided general commercial liability coverage to Harvill continuously from September 1, 2000 until September 1, 2004.  (Doc. 51, Exh. A, at 62; doc. 53, Exh. 1.)  In relevant part, the Amerisure policy reflected that it would cover Harvill for "property damage" only if such damage (i) was caused by an "occurrence," and (ii) occurred during the policy period.  (Doc. 51, Exh. Y, at 1.)  The Amerisure policy defined the term "occurrence" as meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 12.)  The Amerisure policy also contained a notice provision directing Harvill as follows: "You must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim."  (*Id.* at 9.)

---

letter made no mention of 2003-2004 water intrusion issues on the Dolphin Key balconies, nor insinuated that Dolphin Key viewed the present problems as a continuation or outgrowth of those issues, as opposed to a newly discovered defect.

When Harvill's policy with Amerisure expired in September 2004, Harvill procured a commercial general liability insurance policy from Cincinnati. (Doc. 34, ¶ 6.) Cincinnati was Harvill's CGL carrier from September 1, 2004 to September 1, 2009. (*Id.*)

      **C.**     ***The Dolphin Key Litigation.***

On or about August 1, 2008, Dolphin Key filed suit against Harvill and Dudley Flotte (the architect who approved the use of untreated LVLs) in Baldwin County Circuit Court. (Doc. 53, Exh. 10.) The complaint in that case could not have been more clear as to time frame, alleging that "[i]n the Spring of 2007, the balconies began to sag." (*Id.*, ¶ 8.) The complaint traced the sagging-balcony problem back to the use of untreated materials as supportive beams for the balconies, and further alleged "that improper waterproofing of the balcony decking and intersections resulted in moisture exposure to these beams and failure thereof." (*Id.*) Pursuant to these and similar allegations, Dolphin Key brought claims against Harvill and Flotte for breach of contract, negligence and suppression. Undergirding these claims were Dolphin Key's theories that Harvill had failed to perform its work in a workmanlike manner or in a manner consistent with the job's plans and specifications, and that Harvill had failed to address waterproofing issues in a good and workmanlike manner but instead substituted improper materials, all without notifying Dolphin Key. (Doc. 53, Exh. 10.) In April 2009, Dolphin Key amended its complaint in the state court action to name a host of other contractors as defendants; however, its claims and theories of liability against Harvill were not materially altered. (Doc. 51, Exh. V.) At all times, the damages sought by Dolphin Key from Harvill were those resulting from "the improper substitution of materials, improper waterproofing details and design, the improper execution of waterproofing details, and/or the improper use and installation of materials," all of which, in Dolphin Key's view, rendered it "necessary to tear out large sections of the balconies to replace the affected beams, supports and surrounding components." (*Id.*, ¶ 13.)

As stated *supra*, Harvill provided notice to Amerisure of Dolphin Key's potential claims on or about June 4, 2007. Following its investigation, on July 25, 2007, Amerisure informed Harvill in writing that it was disclaiming coverage "[b]ecause the damages are clearly outside of Amerisure Insurance Company's policy term." (Doc. 51, Exh. T.) Amerisure directed Harvill's attention to policy language stating that Amerisure was furnishing coverage only for property damage that "occurs during the policy period," and unequivocally set forth Amerisure's position that the damages claimed by Dolphin Key occurred outside that period. (*Id.*)

Approximately a week after Amerisure denied coverage, Dolphin Key filed suit against Harvill in state court.  At that time, Cincinnati (which was Harvill's commercial general liability carrier as of August 2007) assumed the defense on Harvill's behalf and retained counsel to represent Harvill's interests in the Dolphin Key lawsuit.  (Doc. 34, ¶ 15.)  Thereafter, Harvill and/or Cincinnati continued to lobby Amerisure to provide coverage for Harvill in the Dolphin Key lawsuit.  In the summer of 2009, Amerisure received additional documentation and information that Cincinnati contended established a duty to provide coverage; however, on October 23, 2009, Amerisure issued another written coverage disclaimer to Harvill, reiterating its stance that, among other things, Dolphin Key was not alleging any damages that resulted from an "occurrence."  (Doc. 51, Exh. X.)[9]  Cincinnati and/or Harvill periodically asked Amerisure to reconsider its coverage position in late 2009 and early 2010 through the duration of the Dolphin Key lawsuit; however, Amerisure neither wavered nor backed down.  (Doc. 51, Exh. A, at 95-105.)  So Cincinnati reluctantly continued to furnish a defense to Harvill in that litigation.

On February 11, 2010, Harvill's counsel in the Dolphin Key lawsuit notified Amerisure in writing that a mediation had been scheduled.  (Doc. 51, Exh. CC.)  Counsel again asserted Cincinnati's contention "that Amerisure is the primary insurer of G. R. Harville [*sic*], Inc. and has the primary responsibility for all defense costs and settlement."  (*Id.*)  Amerisure elected not to participate in the mediation session.  Ultimately, mediation was fruitful, as Harvill settled all of Dolphin Key's claims against it for $25,000.  (Doc. 51, Exh. DD.)[10]  Harvill's $25,000 settlement contribution was paid by Cincinnati.  Also, Cincinnati footed the bill for Harvill's attorney's fees and expenses incurred in defense of the Dolphin Key litigation, to the tune of $168,842.06.  (Doc. 34, ¶¶ 20-21.)

---

[9]      In the October 23, 2009 letter, Amerisure notified Harvill that coverage was also being denied because the alleged damages were only to the building that Harvill was contracted to build and only to Harvill's own work, such that coverage was excluded.  (*Id.*)  Amerisure does not rely on the "your work" exclusion in this lawsuit.  (Doc. 51, Exh. A, at 95.)  Accordingly, the Court need not and will not consider that exclusion here.

[10]      Harvill was one of eight defendants who contributed to the Dolphin Key settlement, which totaled $115,000.  (*Id.*)  Harvill's $25,000 share was the largest single-defendant payment to the settlement amount, matched by architect Flotte's $25,000 contribution.

Unfortunately, settlement of the Dolphin Key litigation did not conclude the matter. When Cincinnati and Amerisure failed to reach an amicable resolution of Cincinnati's request that Amerisure contribute to the $193,000 in settlement and defense costs incurred on Harvill's behalf, Cincinnati (acting as Harvill's subrogee and assignee) initiated this action against Amerisure in federal court.  Cincinnati's Second Amended Complaint (doc. 34) asserts state-law causes of action for breach of contract (alleging that Amerisure breached a contractual duty to defend and indemnify Harvill in the Dolphin Key litigation pursuant to the applicable insurance policy), negligence (alleging that Amerisure negligently breached its contractual duties to defend and indemnify Harvill),[11] contribution (alleging that Cincinnati is entitled to contribution because Amerisure breached the Harvill insurance policy), unjust enrichment (alleging that Amerisure had a duty to defend and indemnify Harvill, and that Cincinnati did not, such that Cincinnati unfairly incurred extensive settlement and defense costs while Amerisure reaped the benefit of these expenditures), and equitable subrogation (alleging that as a matter of fairness and equity, Amerisure must defend and indemnify Harvill because it received premiums from Harvill then shirked its coverage duties).  Despite these various permutations of claims interposed by Cincinnati, all of them share a common feature, to-wit:  All rest on the premise that Amerisure was in breach of its contractual duty to defend and indemnify Harvill in the Dolphin Key litigation.  If there was no such breach, then all of Cincinnati's causes of action necessarily fail.

---

[11]  The tort claim is meritless on its face.  After all, Cincinnati unequivocally disclaims bringing a bad faith claim, indicating that "Plaintiff's negligence count is not based upon bad faith."  (Doc. 34, at 58.)  So the theory must be that Amerisure negligently denied Harvill's claim for defense and indemnity.  But Alabama law does not recognize a cause of action for negligent claims handling.  *See, e.g., Kervin v. Southern Guar. Ins. Co.*, 667 So.2d 704, 706 (Ala. 1995) (observing that the Alabama Supreme Court "has consistently refused to recognize a cause of action for the negligent handling of insurance claims"); *Hillery v. Allstate Indem. Co.*, 705 F. Supp.2d 1343, 1367 (S.D. Ala. 2010) (collecting case law showing that Alabama courts do not recognize claims for negligent handling of insurance claims); *Alverson v. Auto-Owners Ins. Co.*, 2007 WL 437601, *2 (S.D. Ala. Feb. 6, 2007) ("It is certainly true that Alabama does not recognize a claim against an insurance company for negligent handling of an insurance claim, instead limiting the insurer's exposure to a claim for bad faith.").  Against this unyielding wall of precedent, plaintiff identifies no Alabama authority suggesting such a theory is or might be viable in the circumstances presented here.  Plainly, Cincinnati cannot recover from Amerisure on a tort theory for alleged negligent acts and omissions by Amerisure in processing, investigating, and denying Harvill's claims for defense and indemnity in the Dolphin Key lawsuit.

Accordingly, this Order focuses on whether Amerisure did or did not owe a duty under the insurance policy to defend and indemnify Harvill as to Dolphin Key's claims. Unless there is a breach of the Amerisure policy, there can be no liability for Amerisure on any of Cincinnati's claims or causes of action.

## II.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The law is clear that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same). The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no

dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits"). Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307. Such is the case here.

## III.    Analysis.

As discussed previously, this action hinges on whether Amerisure owed coverage to Harvill for the claims asserted by Dolphin Key. Alabama law unequivocally places the burden on the party seeking coverage to prove the existence of such coverage. *See Alabama Hosp. Ass'n Trust v. Mutual Assur. Soc. of Alabama*, 538 So.2d 1209, 1216 (Ala. 1989) ("The trial court correctly placed the burden on AHAT as the one seeking coverage to prove that coverage existed within the terms of the policy."); *Jordan v. National Acc. Ins. Underwriters Inc.*, 922 F.2d 732, 735 (11th Cir. 1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage."); *Thorn v. American States Ins. Co.*, 266 F. Supp.2d 1346, 1349 (M.D. Ala. 2002) ("Under Alabama law, the insured bears the burden to establish coverage by demonstrating that a claim falls within the policy …."). To be sure, that burden shifts to the insurer where policy exclusions are in play. Here, Amerisure does not invoke any exclusionary clauses of the policy as a basis for denying coverage; therefore, the burden rests squarely on Cincinnati (as the party seeking coverage) to prove that it exists. That allocation of burdens informs the Court's analysis of the two critical coverage issues about which the parties disagree, to-wit: (i) whether there was an "occurrence" within the policy terms; and (ii) if so, whether that occurrence took place within the policy period.[12]

### A.      Was There an "Occurrence"?

The parties first spar over whether there was an "occurrence" that would give rise to Amerisure's defense and indemnity obligations. Recall that, on its face, the Amerisure policy

---

[12]     Amerisure also maintains that coverage is barred by Harvill's noncompliance with the policy's notice provisions in 2003-2004, when balcony issues were first observed. The Court finds it unnecessary to reach this argument, in light of its disposition of the other two primary points of contention between the parties. In any event, the Dolphin Key litigation plainly had nothing to do with losses incurred by the complaining party (and repaired by the insured) in 2003 or 2004, and Harvill notified Amerisure promptly upon becoming aware of the 2007 claims; therefore, the policy's notice provisions cannot reasonably be read as precluding coverage here.

provided coverage to Harvill for property damage only if said damage "is caused by an occurrence." (Doc. 51, Exh. Y, at 1.) "Occurrence" was a defined term in the policy meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 12.)

From the inception of this dispute, Amerisure has been adamant that Dolphin Key's claims against Harvill for the failed balcony beams and the resulting damage to the condominium do not qualify as an "occurrence" under the policy. In support of its position, Amerisure cites Alabama authority holding that repair and replacement of an insured's defective work is not considered an "occurrence" for purposes of insurance coverage.[13] *See U.S. Fidelity & Guar. Co. v. Warwick Development Co.*, 446 So.2d 1021, 1023 (Ala. 1984) (finding no "occurrence" within coverage language of policy for claims based on "faulty workmanship and noncomplying materials in the construction of plaintiff's residence when the alleged damage was confined to the residence itself"). Last year, the Alabama Supreme Court amplified and clarified state law as to when defective work may lead to an "occurrence" for insurance coverage purposes. In particular, the Court synthesized and harmonized earlier decisions by opining that "faulty workmanship itself is not an occurrence but that faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to 'continuous or repeated exposure' to some other 'general harmful condition' … and, as a result of that exposure, personal property or other parts of the structure are damaged." *Town & Country Property, LLC v. Amerisure Ins. Co.*, --- So.3d ----, 2011 WL 5009777, *5 (Ala. Oct. 21, 2011).

In *Town & Country*, then, the Alabama Supreme Court established a clear bright-line rule as to when, in the liability insurance context, damages related to faulty workmanship are an occurrence giving rise to coverage, and when they are not. Specifically, an insurer is not required to indemnify its insured for a judgment "insofar as the damages represented the costs of repairing or replacing the faulty work." *Town & Country*, 2011 WL 5009777, at *5. By contrast, where a general contractor is held liable for work performed by a subcontractor that resulted in "damaged personal property – e.g., computers and furnishings – or otherwise

---

[13]     Both parties agree that this dispute is governed by Alabama law; therefore, the Court will not *sua sponte* embark on a choice of law analysis, but will apply Alabama law just as the parties have done.

nondefective portions of the facility," then "[t]hose damages would constitute 'property damage' resulting from an 'occurrence,' and they would be covered under the terms of the Amerisure policy." *Id.* at *6. To summarize *Town &* Country, the rule in Alabama is that there is an "occurrence" when faulty work results in damage to nondefective parts of a structure or property, but that there is no "occurrence" insofar as the insured is held liable for repairing or replacing the faulty work itself.[14]

Amerisure's "occurrence" argument centers on the following assertion: "all of the claims against Harvill arose from the defective construction of the balconies at the Dolphin Key Condominiums. … [T]he complaint itself makes it clear that the damage is limited solely to the defective balconies in [*sic*] the Dolphin Key owners were seeking repair and replacement costs." (Doc. 54, at 5.)[15] So Amerisure's argument is that coverage to Harvill is negated under *Town & Country* because the Dolphin Key litigation was solely about damage to defective balconies, and Dolphin Key sought only to repair and replace faulty work itself, such that there is no "occurrence" under Alabama law.

---

[14]    In *Town & Country*, a $650,100 judgment had been entered against the insured. The Alabama Supreme Court remanded with instructions for the trial court to determine which of those damages "represented the costs of repairing or replacing the faulty work itself" (which damages were not an "occurrence" giving rise to coverage) and which, if any, of those damages "represented compensation for … otherwise nondefective portions of the facility" (which damages would constitute "property damage" resulting from an "occurrence"). 2011 WL 5009777, at *6. So this rule creates a system of apportionment of damages, pursuant to which an insurer's indemnity obligation applies to those damages representing compensation for nondefective portions of a construction job, but not those representing the costs of repairing or replacing defective work. Following remand, the Alabama Supreme Court concluded in *Town & Country* that "the only specific property damage caused by an occurrence" that was identified in the record "was testimony that nondefective ceiling tiles damaged by roof leaks had to be replaced at a cost of $600. The damage to the ceiling tiles is property damage caused by an occurrence, and, accordingly, T & C is entitled to damages in the amount of $600." *Town & Country Property, L.L.C. v. Amerisure Ins. Co.*, --- So.3d ----, 2012 WL 2477925, *3 (Ala. June 29, 2012). Thus, the insurer in *Town & Country* was held responsible for just $600 of the total $650,100 judgment against its insured, with the remainder being deemed not an "occurrence" within the scope of the policy language because it represented costs of repairing or replacing the faulty work itself.

[15]    Amerisure recognizes and applies the *Town & Country* standard. In its reply brief, for example, the centerpiece of Amerisure's argument is that "[f]or there to be an 'occurrence' there had to have been damage to something other than the defective work (the balcony)" (doc. 60, at 1), which is nothing more than a restatement of the *Town & Country* rule.

On this point, Amerisure's position is not well taken. Recall that Cincinnati is claiming that Amerisure breached not only its duty to indemnify, but also its duty to defend. Indeed, nearly seven-eighths of the damages claimed by Cincinnati constitute costs of furnishing a defense to Harvill ($168,000), rather than the ultimate cost of indemnifying Harvill for Dolphin Key's claims ($25,000). Under Alabama law, the duty to defend is more expansive than the duty to indemnify.[16] In evaluating whether a duty to defend exists, Alabama courts have held that "[t]he insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between insurer and insured prove a covered accident or occurrence." *Tanner v. State Farm Fire & Cas. Co.*, 874 So.2d 1058, 1065 (Ala. 2003); *see also Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 14 (Ala. 2001) ("If the allegations of the injured party's complaint show an accident or occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured."). Accordingly, courts assessing an insurer's duty to defend under Alabama law look both to the allegations of the underlying complaint and additional record facts outside the complaint to determine whether a covered occurrence has been alleged or proved.

Undoubtedly, Dolphin Key's claims against Harvill were in large part aimed at damage to the balconies themselves, such that Dolphin Key was suing Harvill for the cost of repairing or replacing defective workmanship on the property. For example, Dolphin Key's pleading alleged that Harvill had used or caused to be used improper materials for the balconies, as a result of which Dolphin Key had "to tear out large sections of the balconies to replace the affected beams, supports and surrounding components." (Doc. 51, Exh. V, at ¶ 13.) An itemized list of damages circulated by Dolphin Key in August 2009 reflected a large line item for "Remediation of balconies," including "Removal and remediation of LVL's, decking, ceilings on balconies." (Doc. 51, Exh. BB, at 5.) Clearly, then, Dolphin Key sought recovery of damages from Harvill for the cost of repairing and replacing faulty work on the balconies themselves. As to those

---

[16]     *See, e.g., Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*, 990 F.2d 598, 605 (11th Cir. 1993) ("Alabama holds that an insurer's duty to defend may be broader than its duty to indemnify."); *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1011 (Ala. 2005) ("This broad duty on the part of an insurer to defend an insured arises out of the principle that an ambiguous insurance policy is to be construed liberally in favor of the insured and strictly against the insurer.").

damages, there was no "occurrence" under the Amerisure policy that might trigger a duty to defend or indemnify Harvill because "faulty workmanship itself is not an occurrence." *Town & Country*, 2011 WL 5009777, at *5 ("the trial court in this case properly relied on *Warwick* to hold that Amerisure was not required to indemnify Jones-Williams for the judgment entered against it insofar as the damages represented the costs of repairing or replacing the faulty work"). Amerisure's argument is right on target, as it applies to Dolphin Key's claims for repair or replacement of damage to the balconies as to which Harvill had been general contractor.

Amerisure's problem is that its assertion that, with respect to Dolphin Key's claims against Harvill, "the damage [was] limited solely to the defective balconies" (doc. 54, at 5) is inaccurate. Dolphin Key's pleading referenced not only repairs to the balconies, but also replacement of "surrounding components." (Doc. 51, Exh. V, at ¶ 13.)[17] Moreover, the August 2009 schedule of damages circulated by Dolphin Key listed a $19,970.00 line item for "framing & replacement of drywall" and a $34,270.38 line item for "removal and remediation of EIFS," or synthetic stucco. (Doc. 51, Exh. BB, at 5.) And photographs supplied by Dolphin Key during the litigation vividly depicted that the repairs for which Dolphin Key sought recovery extended beyond the balconies themselves, to other non-defective areas of the building. (Doc. 51, Exh. AA.)[18] There is no evidence and no reason to believe that the original installation of stucco and

---

[17]    Erika Refka, Amerisure's claims representative who handled Harvill's claim, testified that she was "[m]aybe not exactly" certain what Dolphin Key meant by "surrounding components," but that she just "took it as the components of the balcony system." (Doc. 51, Exh. A, at 74.) Certainly, it is a fair point to recognize ambiguity in the phrase "surrounding components." Reasonable investigation would have revealed, however, that Dolphin Key was claiming damages for non-defective parts of the property that had been damaged as a consequence of faulty workmanship on the balconies. Under Alabama law, Amerisure was duty-bound to perform just such an investigation in exploring whether it had a duty to defend Harvill. *See Tanner*, 874 So.2d at 1064 ("If there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured.") (citations omitted).

[18]    For example, Photograph 9 in that exhibit depicts Dolphin Key's removal and repair of stucco outside the balcony areas as a result of water damage to the balconies themselves. (Doc. 51, Exh. AA, at 14.) That photograph is compelling evidence of repairs to damages outside of the balconies (*i.e.*, damage to otherwise non-defective portions of the facility caused by faulty workmanship on the defective portions of the facility). The same goes for the cracked stucco shown in Photograph 11 of that exhibit.

drywall on the property was defective; rather, these were non-defective areas that were damaged as a consequence of faulty workmanship to the balconies.  These types of damages were sought by Dolphin Key "to compensate it for damage the faulty construction later caused to … some otherwise nondefective portion of the [Dolphin Key] property," such that "[t]hose damages would constitute 'property damage' resulting from an 'occurrence,' and they would be covered under the terms of the Amerisure policy."  *Town & Country Property, L.L.C. v. Amerisure Ins. Co.*, 2012 WL 2477925, *1 (Ala. June 29, 2012) (citations omitted).

In sum, then, careful review of the record establishes that Dolphin Key's claims against Harvill included both damages that would qualify as property damage resulting from an occurrence, and damages that would not.  As long as even part of Dolphin Key's claims constituted an "occurrence," Amerisure owed Harvill a defense of that portion of the claims in the underlying action.  *See Tanner*, 874 So.2d at 1065 ("If the allegedly injured person's complaint against the insured alleges or the evidence proves not only claims based on a covered accident or occurrence but also claims not based on a covered accident or occurrence, the insurer owes a duty to defend at least the claims based on a covered accident or occurrence."); *Brown*, 832 So.2d at 14 ("When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy.").  Accordingly, Amerisure's argument that it was excused from defending Harvill because there was no "occurrence" (inasmuch as Dolphin Key merely sought damages to repair or replace the faulty balconies themselves) does not defeat coverage, and does not establish that Cincinnati's claims must be denied as a matter of law.[19]

### B.      Was There an "Occurrence" within the Policy Period?

The finding of an "occurrence" is not dispositive because Amerisure and Cincinnati disagree as to whether such occurrence arose during the policy period.  Recall that Amerisure

---

[19]      In one of its briefs, Amerisure argues that there was no "occurrence" in 2003 or 2004 because the repairs at issue then were solely to the balconies themselves.  (Doc. 57, at 2-3.)  Whether the damage observed in 2003-2004 was an "occurrence" does not matter because Cincinnati is not demanding that Amerisure provide coverage for Harvill's repair costs incurred in 2003-2004.  As discussed *supra*, Dolphin Key's claims against Harvill (for which Harvill and Cincinnati sought Amerisure coverage) were directed solely at repairs performed in 2007, not repairs dating back to 2003-2004; thus, the appropriate question is whether the 2007 property damages were an occurrence, not whether the 2003-2004 damages were.

provided commercial general liability insurance coverage for Harvill from September 1, 2000 through September 1, 2004.  By the terms of the policy, coverage for property damage existed only where such damage "occurs during the policy period."  (Doc. 51, Exh. Y, at 1.)  Amerisure argues that the property damage animating Dolphin Key's claims occurred in early 2007 and is therefore well outside the applicable policy period.  By contrast, Cincinnati insists that the property damage occurred in 2003, during the applicable policy period.  Amerisure's obligations to Harvill (and, hence, its liability to Cincinnati) hang in the balance.

Alabama law is clear that, in determining the timing of an "occurrence" for insurance coverage purposes, the relevant inquiry is when the property damage took place, not when the underlying work was performed.  *See U.S. Fidelity & Guar. Co. v. Warwick Development Co.*, 446 So.2d 1021, 1024 (Ala. 1984) ("A majority of courts have held that in order to have liability under the terms of such a policy the 'occurrence' must arise during the policy period, for it is the insurance that is in force at the time of the property damage that is applicable rather than insurance that was in force when the work was performed.") (citations omitted).  Simply put, "as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy ***is not the time the wrongful act was committed but the time the complaining party was actually damaged***."  *Warwick*, 446 So.2d at 1024 (citations omitted and emphasis added).  This rule (which is sometimes labeled in the literature as a manifestation theory for triggering coverage) is firmly entrenched in Alabama jurisprudence.  *See Alabama Plating Co. v. U.S. Fidelity and Guar. Co.*, 690 So.2d 331, 334 n.1 (Ala. 1996) ("Under the rule of … *Warwick* …, the time of the 'occurrences' under the liability insurance policies at issue is the time the property was actually injured").[20]

---

[20]     *See also American States Ins. Co. v. Martin*, 662 So.2d 245, 250 (Ala. 1995) (recognizing that Alabama Supreme Court has reaffirmed and continues to adhere to the *Warwick* holding concerning timing of an occurrence); *Assurance Co. of America v. Admiral Ins. Co.*, 2011 WL 1897589, *5 (S.D. Ala. May 18, 2011) ("Under Alabama law, as a general rule, the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time the complaining party was actually damaged."); *State Nat. Ins. Co. v. Lewis*, 2007 WL 1975437, *4 (S.D. Ala. July 3, 2007) (applying *Warwick* to conclude as a matter of law that "under Alabama law, there is no coverage for a December 21, 2003 mobile home fire, which occurred outside the applicable policy period of August 18, 2000 to August 18, 2001"); *Liberty Mut. Fire Ins. Co. v. Sahawneh*, 2001 WL 530424, *3 (S.D. Ala. May 11, 2001) ("Alabama law holds that the time of an occurrence of an accident within the (Continued)

The case of *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co.*, 851 So.2d 466 (Ala. 2002), exemplifies and illustrates the proper application of this rule.  In *Wheelwright*, a trucking company sued the manufacturer of 44 trailers it had purchased in 1994, seeking damages for the defective trailers.  Evidence showed the trailers had begun cracking as early as 1995; however, they did not fail (and the trucking company did not lose use of them) until 1998 or 1999.  The manufacturer had commercial liability insurance policies with Liberty for the period of May 1994 through May 1996.  In the ensuing coverage litigation, the circuit court concluded that the coverage-triggering "occurrence" took place in 1995 (when the cracking problem began), not in 1998 or 1999 when the trailers failed and the complaining party lost their use.  The Alabama Supreme Court reversed, reasoning as follows: "The 'occurrence' in this case was not the cracking, but rather the failure of the trailers upon being loaded with the steel coils.  Only at that time, in July 1998, did Wheelwright begin to suffer the damage that led to its claims against Dorsey – the loss of the use of its tractors for the purpose of hauling the steel coils."  *Id.* at 483. On that basis, the Alabama Supreme Court concluded that Liberty was entitled to summary judgment because it provided insurance coverage from 1994 through 1996, yet the "occurrence" animating the lawsuit against the insured took place no earlier than 1998, such that the complaining party was actually damaged outside the respective policy periods.  *Id.*

Applying Alabama's manifestation trigger for liability coverage in the case at bar, it is of no consequence when Harvill performed or oversaw the defective work on the property's balconies.  Instead, the timing of the "occurrence" is pegged to when Dolphin Key was actually damaged.  If Dolphin Key was damaged between September 1, 2000 and September 1, 2004, then the occurrence arose within Amerisure's policy period and Amerisure owed defense and indemnity obligations to Harvill.  If Dolphin Key was damaged after September 1, 2004, then the occurrence arose outside the Amerisure policy period, such that Amerisure owes no coverage to Harvill for that claim (and has no liability to Cincinnati).  After careful examination of the record and the respective arguments of the parties, the Court concludes that there are no genuine issues

---

meaning of an indemnity policy is not the time the wrongful act was committed but the time the complaining party was actually damaged.") (internal quotations marks and footnote omitted).

of material fact and that the occurrence animating Dolphin Key's claims against Harvill happened in spring 2007.

Abundant record evidence supports Amerisure's position that Dolphin Key's property damage for which it made claims against Harvill was first manifested in spring 2007. Significantly, Dolphin Key consistently and unequivocally framed its claims as being for damage that was observed beginning in 2007. Dolphin Key's first amended complaint against Harvill specifically characterized the time frame as follows: "In the Spring of 2007, the balconies began to sag." (Doc. 51, Exh. V, at ¶ 12.) This allegation could not be any clearer in specifying that the property damage for which Dolphin Key sought recovery began in spring 2007. During a June 18, 2007 telephone conference requested by Amerisure, Dolphin Key's attorney never mentioned pre-2007 problems with the property's balconies. (Doc. 51, Exh. A, at 29.) In fact, Amerisure's contemporaneous notes of that discussion memorialize Dolphin Key's counsel's statement that "w/in the last 6 months it was discovered that the wood beams holding up the balconies were discovered to be rotted and sagging." (Doc. 51, Exh. S, at 4.) This time frame was echoed in writing by Dolphin Key's counsel, whose letter to Harvill dated May 25, 2007 indicated that counsel had first become aware of the sagging balcony problem at the property earlier that very day pursuant to a telephone call from Dolphin Key. (Doc. 53, Exh. 6.) And Dolphin Key's lawyer repeated the same time frame in correspondence to Amerisure dated June 18, 2007, wherein he wrote that, "In the spring of 2007, sagging was observed on the east balconies of the condominium." (Doc. 53, Exh. 9.) All of this evidence, which Amerisure received in investigating the claim, was unequivocal that the property damage on which Dolphin Key's claims against Harvill were predicated was first observed in the spring of 2007. Amerisure specifically relied on that unchallenged fact in denying coverage to Harvill for the reason that the "occurrence" was not within the applicable policy period of September 2000 to September 2004.[21]

---

[21]     In particular, on July 25, 2007, Amerisure disclaimed coverage for the stated reason that the property damage occurred outside the policy period, citing Dolphin Key's counsel's representation "that they had discovered these damages within the last six months." (Doc. 51, Exh. T.) An updated coverage disclaimer dated October 23, 2009, reiterated Amerisure's reliance on Dolphin Key's allegations "that the balconies began to sag during the Spring of 2007," which showed that "the damages manifested outside the Amerisure policy term." (Doc. 51, Exh. X.)

Notwithstanding this overwhelming evidence of a spring 2007 occurrence, Cincinnati insists that the proper manifestation date should be deemed to be 2003 based on water intrusion issues that arose at Dolphin Key Condominium then.  In this regard, Cincinnati points to expert Jimmy Fell's field observations of a private balcony at the condominium building on September 9, 2003, wherein he noted that "it is evident that the beam is sagging."  (Doc. 51, Exh. N.) According to Cincinnati, the balcony problems observed by Dolphin Key in spring 2007 are "the exact same problems referenced by the Association's expert in 2003," which means that "the Association's problems with the balconies were continuous from 2003 to 2007," such that the "occurrence" for which Harvill sought coverage actually began in 2003, well within the Amerisure policy period.  (Doc. 59, at 5-6.)

Both logic and fact fatally undermine Cincinnati's position.  As a matter of logic, if Dolphin Key were suing Harvill for something that had been a continuous problem from 2003 to 2007, surely Dolphin Key would not have discussed the balcony issue with its lawyer for the first time on May 25, 2007.  Surely Dolphin Key would have done something to address the problem (in terms of litigation and/or remediation) in the intervening four years.  Surely, it would not have prominently written in correspondence and pleadings that the balconies "began to sag" in spring of 2007, and that it first discovered the problem within six months of June 2007.  Surely if sagging balconies were a continuous, ongoing problem dating back to September 2003, Dolphin Key would have characterized it in its pleadings and correspondence as a construction defect whose slow, gradual deterioration Dolphin Key owners and administrators had observed on a periodic basis throughout that four-year period.  But that's not what Dolphin Key said.  Instead, Dolphin Key told Harvill, Amerisure, the state court, and anyone else who would listen that the balconies began to sag – and the problem was first discovered by Dolphin Key – in the spring of 2007.  This conduct by the complaining party cannot be reconciled with the "continuous problem" theory that Cincinnati champions in trying to shoehorn the spring 2007 "occurrence" into the September 2000 – September 2004 policy window that is a prerequisite for triggering Amerisure coverage.

As a factual matter, it is uncontested in the summary judgment record that, when the water intrusion problems were reported to Harvill in 2003, it worked with Dolphin Key to perform repairs in a mutually satisfactory manner.  Those repairs largely consisted of application and removal of sealants from certain locations on the balconies and railings, as well as bolting

together the lone balcony beam that Fell had observed to be sagging.  Those repairs were completed in 2004 in accordance with Dolphin Key's wishes and to its satisfaction, as evidenced by (i) Dolphin Key's execution of a release in Harvill's favor, and (ii) the absence of any report, observation or indication that there were sagging balconies, cracking stucco or other water intrusion problems at Dolphin Key Condominium between spring 2004 and spring 2007.  There is a dearth of evidence on summary judgment that the complaining party (Dolphin Key) knew that anything was amiss with the balconies between spring 2004 and spring 2007; that it incurred any expenses, lost the use and enjoyment of its balconies, or performed any repairs relating to the balconies between spring 2004 and spring 2007; and that it articulated any dissatisfactions or claims against Harvill of any kind during the period of spring 2004 through spring 2007.  In fact, there is zero evidence that Dolphin Key, its experts, or anyone else believed that the balconies were defective or that they were damaging nondefective parts of the building (such as drywall and stucco) until Dolphin Key discovered the sagging balconies in spring of 2007.  In light of these circumstances, Cincinnati's argument that the "occurrence" arose in 2003 because the property damages were ongoing between 2003 and 2007 is wholly unsupported by the evidence. Instead, what the record shows is a discrete occurrence in 2003 that was remediated to the satisfaction of all in 2004, and then a new discrete occurrence in 2007 that formed the sole basis of Dolphin Key's claims for which Harvill sought coverage from Amerisure.  Cincinnati cannot bootstrap claims relating exclusively to a 2007 problem to the Amerisure policy period by referencing a previous problem experienced at the property in 2003, during the policy period.

In the final analysis, Cincinnati's argument fails because it rests on an untenable construction of the timing of an "occurrence" under Alabama law.  Again, the Alabama Supreme Court has established a bright-line rule that "the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time the complaining party was actually damaged."  *Warwick*, 446 So.2d at 1024.  When was Dolphin Key "actually damaged"?  Cincinnati's theory is that each droplet of water that seeped into the balconies between 2003 and 2007 actually damaged Dolphin Key by contributing to the eventual, catastrophic failure of the balconies when the beams rotted.  In Cincinnati's view, because there was "continued water penetration from 2003 to 2007," the damage underlying Dolphin Key's lawsuit against Harvill occurred beginning in 2003.  (Doc. 59, at 6.)  But Alabama courts have never construed the manifestation trigger so broadly as to be satisfied by

incremental, imperceptible property deterioration that the complaining party cannot see, does not observe, and does not even know is happening, especially where the complaining party had full use and enjoyment of the property during that period and did not bring claims for damages during that period.[22]

Again, the *Wheelwright* case is instructive.  In *Wheelwright*, the trailers purchased from the insured began cracking almost immediately, but the complaining party continued to use them (and was oblivious to the cracking problem) for three years until the ongoing deterioration finally rendered the trailers unusable.  If Cincinnati's view of Alabama law were correct, then the "occurrence" should have been the onset of the cracking, which happened incrementally beginning the day the complaining party purchased the trailers.  However, the Alabama Supreme Court ruled in *Wheelwright* that the complaining party was not actually damaged until it lost the use of its trailers when they failed three years later, and that there was no "occurrence" until that failure.  In much the same way, Dolphin Key was not "actually damaged" by Harvill's wrongful conduct until the balconies sagged in spring of 2007, even though the beams may have been slowly rotting for years before then, unbeknownst to Dolphin Key.  The incremental deterioration of the balconies did not harm Dolphin Key at all between spring 2004 and spring 2007.  During that time frame, the complaining party was using and enjoying the balconies, was not spending money to repair or replace them, and was unaware of any problems.  Only when the balconies sagged did Dolphin Key incur the expense and inconvenience of having to tear out and replace the balconies and nearby stucco and drywall.  Simply put, until those balconies were observed to sag in early 2007, Dolphin Key had not suffered any damage.  Therefore, the "occurrence" triggering insurance coverage obligations happened in 2007, several years after the

---

[22]     As a practical matter, the effect of interpreting the trigger in the manner advocated by Cincinnati would be to erode *Warwick*'s manifestation rule and effectively transform it into a wrongful-act rule.  Where, as here, faulty construction work results in gradual deterioration of the property, if an "occurrence" were deemed to have happened the instant that deterioration began, then the occurrence would be the wrongful act itself, since the deterioration commenced immediately thereafter.  So, through its extraordinarily expansive notion of when a complaining party is actually damaged, Cincinnati would have the manifestation rule collapse into a wrongful-act rule.  There is no support in Alabama case law for usurping and undermining *Warwick* in this manner.

expiration of Amerisure's commercial general liability insurance policy issued to Harvill.  In light of that determination, there is no coverage, as a matter of Alabama law.[23]

## IV.   Conclusion.

Amerisure provided insurance coverage to Harvill from 2000 to 2004.  Policy language was clear that Amerisure owed coverage for property damage that "occurs during the policy period."  The complaining party (Dolphin Key) expressly and repeatedly stated to Harvill, to Amerisure, and to anyone else who would listen that its claims against Harvill arose when the property's balconies began to sag in 2007, which prompted Dolphin Key to incur substantial expense in tearing out and replacing the balconies and surrounding components.  Under Alabama law, Dolphin Key was actually damaged in 2007 (when the balconies began to sag), not before.  Previous damage to the balconies had been remedied in 2004, and Dolphin Key clearly communicated that such earlier damage was not part of its claim against Harvill.  As such, the property damage in question occurred well outside the relevant policy period, and Amerisure owed no duty to defend or indemnify Harvill against Dolphin Key's claims.  Given that Amerisure owed no duty to provide coverage to Harvill in connection with Dolphin Key's claims, Cincinnati's causes of action herein (all of which are fundamentally rooted in the notion that Amerisure owed a contractual duty of defense and indemnification to Harvill) fail as a matter of law.

For all of the foregoing reasons, Plaintiff's Motion for Summary Judgment (doc. 50) is **denied**, and Defendant's Motion for Summary Judgment (doc. 52) is **granted**.  This action is **dismissed with prejudice**.  A separate judgment will enter.

---

[23]      To combat this argument, Cincinnati insists that summary judgment cannot be entered in Amerisure's favor because "[t]here are clearly questions of fact as to when the Dolphin Key Condominium Association was actually damaged."  (Doc. 58, at 16.)  The undersigned disagrees.  After all, the foregoing analysis takes all of the record facts in the light most favorable to Cincinnati, and makes a finding that, as a matter of law, those facts are insufficient to support a finding that the "occurrence" happened during Amerisure's policy period.  There are no material disputed facts on this point.  What the parties dispute is not what the facts are, but whether those facts raise a reasonable inference of a 2003 "occurrence" that might satisfy Cincinnati's burden of proving coverage at trial.  After careful consideration of Alabama precedents, the Court answers that question in the negative.

DONE and ORDERED this 12th day of September, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE